[No. 2007.]

## T. W. Wallace v. The State.

1. Murder — Manslaughter — Self-Defense. — Charge of the Court should not instruct the jury upon defenses not raised by the evidence. See the opinion and the statement of the case for evidence in a murder trial *held* not to present the issues of manslaughter or self-defense; wherefore the trial court properly refused to instruct the jury upon the law of those defenses.

2. Same.— It is no excuse, justification or extenuation of murder that it was perpetrated by a convict in an attempt to effect his escape by killing an officer who, in discharge of his duty, was endeavoring to recapture the convict.

3. Same — Circumstantial Evidence — Fact Case.— See the opinion and the statement of the case for evidence, which, though circumstantial, is *held* sufficient to support a conviction for murder in the first degree.

Appeal from the District Court of Cherokee. Tried below before the Hon. J. I. Perkins.

The indictment charged the appellant, jointly with John Kennedy and G. W. Miller, with the murder of George W. Taylor, in Cherokee county, Texas, on the 15th day of March, 1884. The appellant, being alone upon trial, was convicted of murder in the first degree, and his punishment was assessed at a life term in the penitentiary.

F. P. O'Brian was the first witness for the State. He testified that in March, 1884, he occupied his present position as assistant superintendent of the Texas State penitentiaries, and in the said March was in charge of the branch located at Rusk, in Cherokee county, and known as the East Texas penitentiary. All of the convicts confined at that branch, and all of the guards and employees, were then in the charge and under the control of the witness. The witness first saw the defendant, he thought, in October, 1883. Defendant had been previously received as a convict, but had been at work at some of the convict camps. Witness assumed charge of him as a convict, and had charge of him from that time until March 15, 1884, when he escaped and was at large until May, 1885, when he was returned to the penitentiary at Rusk, and to the charge of witness. He was sent to the penitentiary from Wise county, Texas, to serve a term of five years for burglary. Two other convicts, named Kennedy and Miller, escaped at the same time and with the defendant.

A number of squads of convicts, three or four in a squad, and each squad under a guard, and all of the squads under the special charge of Sergeant George W. Taylor, were turned out of the penitentiary at Rusk, on the morning of March 15, 1884, to go to the

coaling fields, about one and a half miles southeast of the penitentiary buildings, to burn coal for the use of the penitentiary furnaces. A squad composed of the defendant, Miller and Kennedy was under the immediate charge of a guard named Charles Irby. The several squads with their guards, except Irby and his squad, returned to the penitentiary about sundown, when the escape of the defendant, Miller and Kennedy was reported to the witness. With Sergeant G. W. Taylor, his son William Taylor, Hiram Newman, John J. Dial, Joe Summers, and probably some one else, witness proceeded to the point where the fugitives were seen to cross a fence between the residences of Judges Willson and Priest. At this point the witness put track hounds on the trail, which was only about thirty minutes old. The time was near sundown. The hounds took the trail at once, leading off rapidly in a southeast direction. Witness and his party followed as rapidly as possible over the rough ground, and through the woods. They were sometimes abreast, and sometimes ahead of some of the hounds, but there were others of the dogs constantly ahead of the party, though never out of hearing. Frequent stops were made to determine the course of the dogs in the lead. A ride of about five miles in a southwesterly direction brought the party, just at dark, to a creek, where the dogs had stopped in a body and were furiously "baying" an object which was invisible through the thicket lining the banks of the creek. The dogs being especially well trained and efficient track hounds, the witness and his associates became satisfied that they had brought the fugitives to bay. When the creek was reached, the deceased, Sergeant Taylor, was a little ahead and to the left of the witness; William Taylor a little ahead and to the right of witness, and Dial something like a hundred yards in the rear. It was too dark to see the object bayed by the dogs, or very distinctly to see each other and the dogs. The dogs were bunched very near the creek bank. When the party, in the positions mentioned, reached a point within twenty or thirty steps of the dogs, a shot-gun was fired from the direction of the point in the thicket at which the dogs were baying. Some one replied with a pistol shot, from about the point where William Taylor and Newman then were. Newman was wounded by the first shot. The dogs moved down the creek some forty or fifty yards, when they stopped and bayed again. Deceased followed to a point somewhere near the dogs. Witness fired his pistol in the direction of the point indicated by the baying of the dogs. Deceased called out: "Don't shoot this way." Two shots from a shot-gun were then fired from the point in the thicket at which the

dogs were then baying, and the dogs moved off again, down the creek.

About this time the witness rode forward and joined William Taylor and Newman, and discovered that both Newman and his horse had been wounded by the first shot. He asked William Taylor where his father was. William replied that he did not know, but was afraid he had been killed. Witness and William then rode forward, and at about twenty paces they met deceased's horse coming back riderless. A few steps beyond they found the dead body of Sergeant Taylor. The body lay in an open space of ground, six or eight feet from two large trees which grew very close together. Several buck shot had penetrated the breast of the deceased and killed him. There was some little blood on the clothing, a little on the ground where the body lay, and some on the saddle and blanket on the horse from which he was shot. No pistol was found on or near the body of the deceased, and the witness was unable to say whether or not he carried a pistol with him on that pursuit. Witness gave up the pursuit, had the dogs called off, and proceeded to care for the wounded Newman, and the dead Taylor. He had Newman and the dead body of Sergeant Taylor taken to the house of Mr. Robert Pryor, who lived about a mile from the place of the shooting. Witness returned to the place of the shooting early on the next morning, and found the tracks of persons about and around the two trees near which Taylor's body was found, but saw no blood at that point. He saw blood marks at the point where Newman was wounded, and over the trail pursued by his, Newman's, horse after he was wounded. Taylor's dead body was found within five minutes after the first shot was fired. Witness thought, from his knowledge of fire-arms, that the first shot was fired from a shot-gun, the next from a pistol, the third and fourth from a shot-gun, or shot-guns, then several pistol shots; the witness firing the first two of these latter.

Captain George W. Taylor for three or four, and perhaps more' years preceding his death, had been employed about the East Texas penitentiary, and for the larger part, if not all, of that time, was "outside sergeant," one of his special duties being the recapture and return of escaping convicts. He kept, as auxiliaries in this work, a pack of particularly well trained track hounds and a "catch-dog." Those dogs were usually kept at the penitentiary, and were kept in training or practice by frequently (and sometimes in the view and hearing of the convicts) starting a "trusty" convict or "line-man" in flight, with the dogs in pursuit. The particular dogs used on this

occasion were remarkably well trained animals. Captain Taylor had always been remarkably successful in running down and retaking "escapes" with them. Witness had seen those dogs put on the track of a convict and follow it through a labyrinth of crossing and recrossing tracks of a multitude of other convicts. The rules of the Penitentiary Board, for the government of the penitentiaries, were printed, and their performance formed a part of the oaths of all the penitentiary guards and employees. Captain Taylor, as outside sergeant, had subscribed to that oath. The penitentiary rules neither authorize nor forbid the use of dogs in hunting and running escaping convicts,— they are silent upon the subject. Dogs, however, are kept at the East Texas penitentiary for the one purpose of pursuing escaping convicts. The guards at that penitentiary are furnished with double-barreled, breech-loading shot-guns. The guards in charge of convicts outside of the penitentiary walls were always armed with that gun, and usually carried an extra load of cartridges.

The deceased, for several weeks prior to the killing, had personal charge of the convict force at work in the coaling fields, and directed them daily during that time in the performance of their tasks of burning coal and cutting timber. The convicts belonging to the various squads thus engaged on the 15th day of March, 1884, saw him every day, and knew him. He had a peculiar and loud voice, and used it a great deal on that night, urging his dogs forward. He rode the horse that he usually rode, a large grey horse, and the only grey horse in the party, and from the point where he was shot he could be easily distinguished at a distance of fifteen or twenty yards. The three convicts, defendant, Miller and Kennedy, were under the charge of deceased on the day of their escape, and the subsequent shooting. As soon as convicts are received at the penitentiary, they are stripped of all articles of citizen dress, washed and shaved, and dressed in prison garb. All moneys found in the possession of a convict are taken from him on his arrival at the penitentiary and placed to his credit upon the book. A general description of him, together with his habits as they are disclosed, his name, the county from which he was sent, the crime for which he was convicted, the date of his entrance and the term of his sentence, are all entered upon a book kept for that purpose. The convicts wash and dress themselves as often as is found necessary, always once a week, Sunday being the day so devoted, as a general rule. They are not allowed to converse with each other inside of the prison, but have the privilege when outside at work. The defendant, when received at the penitentiary, had a scar on his right elbow, and another on his right knee. He had seventy-five cents to his credit on the books.

The work in the coaling fields was very dirty work. The convicts employed in that labor necessarily got their clothes very black and dirty, but they used working clothes, which they changed for the prison garb at the close of work on each day, and before their return to the prison for the night. The "catch-dog" which belonged to the deceased was an exceedingly vicious animal, and would mount higher, and come nearer climbing a tree, than any dog the witness had ever seen. He would run with the hounds, generally for a mile or two, but no further. He usually wore a bell, and started with the hounds on the chase that night, but witness did not see him at the point on the creek where the shooting occurred. The "catch-dog" was hard to "keep off," but witness thought that three men acting together could easily have kept off all of the dogs — six or seven in number — with which the party started on that night. Witness did not know how many of the dogs were present at the shooting.

William Taylor testified, for the State, that he was a son of the deceased, and at the time of the killing was engaged as a convict guard at the East Texas penitentiary, located at Rusk, Texas. Witness heard of the escape of Irby's squad of convicts, consisting of defendant, Miller and Kennedy. A few minutes after the pursuing party, consisting of his father, Captain O'Brian, William Hughes, John J. Dial and Hiram Newman, started in pursuit. He immediately, as was his duty, joined the pursuing party, overtaking them at the point where the fugitives crossed the fence between the places of Judges Willson and Priest. At that point the hounds were put on the trail. They led off in a general southwestern course, the party following rapidly. At a distance of about five miles from Rusk the dogs stopped at a creek which flowed through the plantation of Mr. Robert Pryor. Reaching that point the witness found the dogs baying some object in the thicket on the opposite side of the creek. Witness dismounted from his horse, which was shy, and he and Newman, who was still on his horse, started towards the dogs. Just as they got on top of the steep bank, and within twenty or thirty steps of the point in the thicket bayed by the dogs, a shot from a shot-gun was fired from that point, wounding both Newman and his horse. Witness fired his pistol towards the point from which the shot-gun was fired. Deceased, who was then down the creek a short distance to witness's left, called: "Don't shoot any more, boys; they have no more loads, and we will get them now." The dogs then moved down the creek some forty or fifty yards, and again stopped and bayed. Witness could see no moving body in the thicket, but distinctly heard a noise as of some one moving. De-

ceased rode out of the creek to the bank and up to the point where
the dogs were baying.   Within a moment or two two shots were
fired in quick succession from a shot-gun, and witness heard persons
running from the vicinity of two large swamp oak trees that grew
close together, and near which the dogs were baying.   The body of
the deceased was speedily found lying near those trees.   He had
been shot with a shot-gun, or at least with a gun loaded with buck
shot, several of which penetrated his body.   The ground at the
point where the body lay was open.   The deceased's voice could
easily be heard from where his body lay to the trees, and his large
grey horse could be easily distinguished at that distance.

Just after the deceased told witness and Newman to stop shoot-
ing, he called to the convicts to "put down that gun," but did not
call upon them to surrender.   The witness did not know whether or
not the deceased had a pistol with him on the night of his death,
but none was found on or near his body.   No one of the pursuing
party had a shot-gun.   Witness, Newman and the deceased were
near together and ahead of the others of the pursuing party when
the creek was reached.   Captain O'Brian was a short distance be-
hind.   Mr. Dial was a hundred or two yards in the rear of O'Brian.
Hughes was lost before the creek was reached, and Mr. Summers,
who started with the party, turned back after going a short distance.
Witness did not go back to the place of the killing after he left it on
that night.   The "catch-dog" had a bell on his neck when the party
started, but had no bell when the creek was reached.   He was a
somewhat vicious brute, but witness had never known him to seri-
ously injure any one.   The hounds were trained animals, and trained
especially and only to track fugitives.   They would follow the track
of persons only, and could not be induced to trail game or wild ani-
mals.   They were remarkably efficient animals, and could take up
and follow a trail several hours old.   They did not separate on this
pursuit except that some ran faster than others.   The pursuing party
had no signals by which to recognize each other that night, and their
only means of knowing members of the party from the fugitive
convicts was that the pursuers were mounted, and the convicts were
on foot.

D. A. Tipps was the next witness for the State.   He testified that
on the 15th day of March, 1884, and for some time prior thereto,
he was serving as a convict guard at the East Texas penitentiary,
situated at Rusk, Texas.   He knew and had guarded the convicts
Wallace (defendant), Kennedy and Miller.   These three convicts
composed the squad in charge of the guard Charles Irby, on March

15, 1884, and belonged to the force of convicts then working in the coaling fields, about a mile and a half from the penitentiary. Witness had charge of a squad of three men in the same force. The usual course to the coaling fields from the penitentiary was down the track of the Gulf Short Line Railroad, to a point opposite the fields. The return course was over the same route up the track. Coal burning was very smutty, dirty work, and it was the practice daily to march the convicts to water near the railroad track, when they knocked off for the day, where they washed, took off their working clothes and resumed their prison garb. They were then returned to the penitentiary for the night. On the evening of March 15, 1884, when the convict force started back to the penitentiary, Irby's squad, composed of defendant, Miller and Kennedy, fell into line as the rear squad. Witness's squad was immediately in front of Irby's. The force passed up the track of the main line of the railroad, and turned up the penitentiary branch or "spur." When witness's squad had traveled perhaps three hundred yards up that spur, witness heard the report of a gun fired behind him. He looked back but could see nothing of Irby or his squad,— a curve and cut intervening between his point of view and the main track. Witness ordered the convicts in his charge to sit down. When they did so witness looked towards the cut, and saw defendant coming up the cut towards witness with Kennedy close, and Miller some little distance behind. Defendant had a shot-gun in his hands. When he got to a place where he could scale the cut he mounted it, followed closely by Kennedy. The two crouched down behind some dirt, facing witness at a distance of one hundred and twenty-five yards. When Miller reached that point, they extended him the gun, butt foremost. Miller clasped the stock of the gun and was drawn up the bank by defendant and Kennedy. While being pulled up, Miller's right side was exposed to witness, and witness fired at him. The three then fled westerly across a lot. The witness ran his squad into the squad ahead of him, turned them over to the guard in charge, and started in pursuit of the fugitives, who fled towards and over a railroad bridge which crossed a branch. Defendant, who was then in the rear of the other two, stopped on the bridge, "broke" his gun down at the stock, and appeared to be inserting cartridges at the breach. He said something to the witness, which witness could not now remember. Miller and Kennedy waited for defendant until he got across the bridge, and the three then fled across some lots, and when they got near the fence between the places of Judges Willson and Priest, the witness, who was then

Statement of the case.

about two hundred yards off, fired at them. The three crossed the fence and fled southwesterly towards some woods. Witness followed no further, as he had no cartridges to fit the gun he had. The gun he usually carried was taken by some other guard on that day, and the witness had a number twelve gun, and number ten cartridges. Witness then returned, resumed charge of his squad, and reported the escape. He saw Irby, unhurt, when he returned.

The deceased had charge of the coaling force, and had superintended them for several weeks. He always went out with the force in the morning, and returned with them in the evening; his general custom being to go a part of the distance over a wagon road which the force did not travel. He owned a large grey horse, which he rode exclusively while in charge of the convicts, and he circulated daily among the force and the guards, giving orders and directions, and always on that horse. He rode, that horse to and from the coaling fields on March 15, 1884. On the return from the coaling fields on that evening, the deceased left the force at the usual intersection of the railroad and wagon road, and went into town. Witness saw him and reported the escape of Irby's squad, and told him where he last saw the fugitives. The last witness saw of the deceased he was going rapidly to that point followed by his dogs. Witness thought that the gun he had in use on that day would be effective at a distance of one hundred yards. Witness was not near enough, at his second shot, to hit either one of the fugitives, unless by accident. Witness saw a coat, on the day after the escape, which had been previously worn by Miller. It showed two shot holes through the front.

John S. Black testified, for the State, that on the evening of March 15, 1884, he was sitting in the Bird House in the town of Rusk, when he heard the report of a gun, and a noise made by shot striking the house. He then looked and saw two convicts run across a bridge of the Kansas & Gulf Short Line Railroad. Within a moment or two a third convict, armed with a shot-gun, started across the bridge. He stopped about midway, "broke" the gun down at the breach, and went through the process of loading it with cartridges. He then called back to a guard who seemed to be in pursuit: "Tell them to come on; we are ready for them." He then crossed the bridge and followed after the other two, who had fled across the fence between the places of Judges Willson and Priest, near which point, at a distance of two hundred yards, the guard fired at but missed them. The convict with the gun, when the witness last saw him, was about one hundred yards in the rear of the

other two, following them. Witness saw the deceased start the dogs on the trail of the convicts at the fence, about thirty minutes after they crossed it. The dogs trailed off at once, followed by the deceased, Captain O'Brian and others. If the witness heard a shot prior to the one just before he saw the convicts on the railroad bridge, he paid no attention to it. The first shot mentioned by him attracted his attention by striking the house in which he was then sitting.

There was a bend or curve and a deep cut in the "spur" railroad, which led from the penitentiary building to the main line of the railroad. On Sunday morning, being the morning after the escape of the convicts and the murder of the deceased, the witness was shown the point in the cut where it was said the convicts rushed upon, overpowered and disarmed the guard Irby. It was northeast, about two hundred yards from the Bird House. There was a cattle-guard and fence at that point, the fence on each side extending from the ends of the ties on the road-bed to the bank of the cut. The banks at that point were almost perpendicular, and were higher than a man's head. Witness examined for evidences of the discharge of a gun, and found a shot hole, recently made, in one of the planks of the fence. The hole was large and indicated that an entire charge of buckshot had been fired through the plank, at short range. The charge went into the bank beyond, and indicated that a man standing up had fired the gun slanting downward.

John B. Reagan was the next witness for the State. He described the route pursued by himself and others over the trail of the fugitives as far as the neighborhood of Holsomback's residence on the day after the killing. He stated that the deceased was a most efficient man in the pursuit and capture of fugitives from justice, and was at the same time the most vigilant and considerate of prison custodians. He had kept trained hounds since 1857, to the witness's knowledge. Witness and his party searched the vicinity of the murder for the deceased's pistol, but failed to find it.

John E. Pullen testified, for the State, that he resided in Tom Green county, Texas. Witness was acquainted with the defendant. He first met the defendant at the house of one B. F. McAnnally, about four miles distant from the town of San Saba in San Saba county, Texas, on Tuesday, the 6th day of January, 1885. McAnnally introduced the defendant to the witness as Bob Cook. Witness and defendant slept together on that night, and were together until 2 o'clock A. M. on the following Saturday. During the time of their association, witness and defendant had many conversations.

Defendant told witness that he was an escaped convict; that he and two others escaped from his guard one evening while on their return from the coaling fields to the penitentiary at Rusk; that he snatched a double-barreled shot-gun from the hands of the guard, and he and his companions fled; that he then had twenty-one cartridges on his person, for which he had paid to an outside man whose name he did not mention, his last ten-dollar gold piece; that after he made his escape from the guard in whose charge he was, another guard then in pursuit fired upon him and struck him with one shot, on the elbow, when he gave the gun he had captured to one of his companions as he could not use it; that they fled through the woods several miles, chased by a party with dogs, some of which had bells on; that they stopped, made friends of the dogs and removed the bells; that they then went on until they reached a creek bordered by thicket, where they were overtaken by the pursuers. He then said: "We shot one man and killed another of the crowd, and they stopped and we went on." He said that he and his companions traveled together; that they got horses before day and made good their escape, staying together two or three days. He said that the crowd overtook them after dark, and as they had made up their minds to die rather than go back to prison, he and his companions fully expected to be killed. He told witness that the man they killed was the old man who had been running escaped convicts with hounds, and that, after the old man fell, one of the convicts went to his body to get a fine pistol which he generally carried, but that the pistol rolled into the creek, and they did not get it. He did not call the old man's name, but said that he was the man who had been running convicts with dogs. Witness never afterwards saw the defendant until upon this trial. Defendant always used the word "we" in speaking of the killing. He said that a reward of $1,600 was offered for his apprehension. McAnnally, who was subsequently appointed deputy sheriff of San Saba county, heard as much from defendant about his escape as the witness did. Witness knew and saw the sheriff of San Saba county on the day after this conversation, but said nothing to him about it. He knew the sheriff of McCulloch county, in which county he separated from defendant, but said nothing to him about it. It was none of witness's business, and, besides, witness paid but little attention to defendant's narrative. Witness furnished the district attorney with the names of persons to be served as witnesses in this case.

T. N. Holsomback testified, for the State, that on the night of the murder of Captain Taylor, he, witness, lost three horses, two

saddles and bridles, from his residence in Cherokee county, Texas. The tracks of the horses passed north out of witness's field at a point where the fence had been let down, thence into the Jacksonville road and by the residences of J. M. B. McKnight and Anderson Sides. The horses were taken from the lot near witness's house, and the bridles and saddles from a little house near by, kept for the purpose of storing harness, saddles, etc. One of the horses was a sorrel mare with flaxen mane and tail. The other two were bay horses.

J. M. B. McKnight testified, for the State, that between 1 and 2 o'clock on the night of the murder of Captain Taylor, three horses at full speed passed his house, going in the direction of the house of Anderson Sides. Witness could not see the foremost horse, but saw that the remaining two were ridden by men dressed in white clothing.

Anderson Sides testified that three horses at full speed passed his house about 2 o'clock on the night of the murder. Two of the horses had riders. Witness could not tell whether the third had a rider or not.

R. F. Breedlove testified, for the State, that he lived in Cherokee county, about two and a half miles from Troupe, and near the Smith county line. On the evening of Sunday, the day after the murder of Captain Taylor, a man riding a sorrel nag with flaxen mane and tail, rode up to witness's house and inquired for a route to Mineola, avoiding Troupe. Witness directed him and he rode back in the direction whence he came. When he reached the main road he drew a breech-loading shot-gun from his side to his lap. Witness then saw at a distance of one hundred yards further on, two men on bay horses. Witness could not tell how they were dressed. The man who came up to the house had on a slicker, buttoned to the chin, hiding his under garments. The State closed.

Robert Pryor was the first witness for the defense. He testified that the deceased was killed within three-fourths of a mile of his, witness's, house in Cherokee county, Texas. Witness was one of a party who followed the trail of the murderers on the next day. Witness found only the tracks of two persons, and saw them only at two places. One of the places was at a wet, sandy spot not far from the creek, and the other at a point about a half mile from the place of the killing. Witness searched particularly only to determine the course taken by the fugitives, and not to ascertain the number in the party. He saw, however, the tracks of two men, and those were the tracks which appeared to have been followed by the dogs. Witness did not know that the two tracks he saw

were the only tracks in that vicinity, but they were the only ones he saw. He saw no tracks about the point where Captain Taylor's body was found. Witness and his party followed the trail as far as Black Wallace's field, where they lost it.

Doctor W. G. Jameson, surgeon in charge of the penitentiary hospital, testified, for the defense, that he examined the defendant immediately upon his return to the penitentiary. His right arm showed the scar of an old wound. The wound was inflicted at least a year before the witness saw it, and it may have been inflicted ten years before. Defendant had a flesh wound on the shoulder, apparently but few weeks old. A pistol or gun ball in the arm at the place of the scar would not produce much of a flow of blood, but would be likely to paralyze the nerves, and produce stiffness of the elbow. The witness could feel no ball in the arm. The wound in the shoulder was calculated to produce paralysis of the arm.

Black Wallace testified, for the defense, substantially as did the witness Pryor, and, in addition, that some time after the killing he saw a convict coat marked T. W. W., which was found about three-fourths of a mile from the place of the killing of Taylor, towards Rusk. The inside of the coat showed stains resembling blood stains.

John J. Dial testified, for the defense, that he was one of the party in pursuit of the convicts. Witness heard the first shot, which was fired from a shot-gun. He was then about a hundred yards behind Captain Taylor and the others. Hallooing followed the shooting, and witness called to the convicts to surrender and avoid trouble. He did not then know that Newman had been wounded. Other shots from a shot-gun and pistols followed. Witness did not know which shot or shots killed Taylor, who was dead when witness reached him. The witness could not distinguish Captain Taylor's voice from where he was, and had no idea what Captain Taylor said or did at the time he was shot. Witness called in order to locate the party he was with, if possible. No one of the pursuers had a shot-gun. The witness was with the party who examined the vicinity of the tragedy on the next day. He saw the tracks of three men in the bed of the creek near the water, and at another place he saw the tracks of two men. The pursuing party were all on horseback, and the witness thought that by proper management at first the thicket might have been surrounded and the men taken without bloodshed.

Sledge Moore testified that the convicts in their flight passed within forty or fifty yards of him. One of them had a gun. Wit-

ness could hear them talking, but could not understand what they said. They were all close together and remained close together as long as witness saw them. They crossed the fence between Judges Willson and Priest's places.

I. E. Lang testified that on the day of the escape of defendant, Miller and Kennedy, he heard the witness Sledge Moore say, in the presence of several, that when the convicts passed him he heard one of them say: "Go on; I am badly hurt and can't keep up." Witness was at the branch below the railroad bridge, and saw the convicts as they fled. He saw the convict with the gun stop on the bridge and go through the process of loading it. That convict, after loading his gun, called out something of which witness distinguished only the word "Taylor." The three went off together, sometimes in a walk and again in a trot,— the man with the gun bringing up the rear.

J. S. Black, recalled for the defense, testified that he heard the witness Sledge Moore say that when the convicts passed him he heard one of them say: "Go ahead; I can't keep up." He said nothing about being hurt or wounded. The remark of the convict on the bridge, as witness understood it, was: "Tell them to come on; we are ready for them." The witness stood then on the brow of a hill about fifty yards from the convict. The point where Mr. Lang said he was at that time was about one hundred and fifty yards from the bridge.

The motion for new trial complained of the charge of the court, of the refusal of special charges, and contested the sufficiency of the evidence to support the conviction.

*McClure, Owen & Martin*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE. The defendant, jointly with John Kennedy and G. W. Miller, was indicted for the murder of George W. Taylor. He was tried separately from his co-defendants, and convicted of murder in the first degree, the punishment assessed being confinement in the penitentiary for life.

The murder was committed on the night of the 15th of March, 1884, in Cherokee county, Texas, some four or five miles from the town of Rusk. The facts relating to the crime, briefly stated, are as follows: Defendant and his co-defendants were State convicts serving sentences in the East Texas penitentiary, located at Rusk,

in said Cherokee county. · On the day of the homicide they had been at work in the custody of a guard, outside the walls of the penitentiary, and when returning late in the evening, in charge of said guard, to the penitentiary, and when within about one mile thereof, they succeeded, by some means not disclosed by the evidence, in disarming their guard of his double-barreled shot-gun, and they immediately fled into the woods near by. Their escape was at once reported to the officers in charge of the penitentiary, and George W. Taylor, the deceased, being a sergeant of guards at said penitentiary, and it being his special duty to pursue and capture escaped convicts, accompanied by three or four other persons, and also by a pack of trained dogs, pursued said convicts, the dogs having been placed upon their trail. The chase was continued four or five miles, when the dogs overtook and brought to bay the persons whose trail they had been following. It was now night, and the place where the dogs were baying was in a creek bottom, where the brush and undergrowth was quite thick. Deceased and two others of the pursuing company approached to within a short distance of the dogs, and were fired upon from the direction of where the dogs were. One of the pursuing company, and also the horse he was riding, were wounded by this shot. One of the pursuers then fired a pistol shot in the direction of the dogs, and thereupon the dogs moved off as if again in pursuit of the fleeing persons, and after running a short distance again stopped and began baying. Deceased followed after the dogs upon horseback, and when he had arrived within a few steps of the dogs he was fired upon from the direction of the dogs, and was instantly killed. Two reports of firearms, resembling the reports of a shot-gun, were heard at the time and place of the killing, and the wounds in deceased's body were made by shot. After these fatal shots were fired, the dogs continued the chase for some distance, until called back by the pursuers, and neither of the parties who were being pursued were at that time captured. These convicts knew the deceased Taylor; knew that he was a sergeant of the penitentiary guards, and that his particular duty and business were to pursue with dogs and capture escaped convicts. They knew that Taylor and his dogs were pursuing and endeavoring to capture them when they fired upon the pursuers the first time, and when they fired the shots which killed Taylor. That they were the persons being pursued, and the persons who killed Taylor, there cannot be, from the evidence, the shadow of a reasonable doubt. Though the evidence of their guilt is circumstantial, it is of that connected and cogent character which engenders moral certainty, and which absolutely excludes every rea-

sonable hypothesis except the one that these three convicts, acting together, committed the homicide.

The charge of the court to the jury is full, clear and correct, evincing careful preparation, and marked aptness in the application of the law to the facts.

Counsel for the defendant requested special instructions embodying the law of manslaughter and of justifiable homicide upon self-defense. These instructions were properly refused because they were not warranted by the evidence. To reduce a homicide from murder to manslaughter it must have been committed under the immediate influence of sudden passion arising from an adequate cause. In this case, the evidence shows a sedate and deliberate mind on the part of the slayers in the commission of the act, and a formed design to kill. That the killing was upon express malice is abundantly established by the testimony. There is not a fact in the case which would have justified the court in charging the law of manslaughter.

As to self-defense, there is no evidence presenting the issue. Deceased, in pursuing and attempting to capture the convicts, was in the discharge of his duty as an officer. The law and his oath of office required of him a prompt and faithful performance of this duty. His pursuit and attempt to capture them was therefore lawful. It was in no sense an " unlawful and violent attack " upon them. There can be no self-defense unless the resistance be to prevent the perpetration of a felony, as provided in article 570 of the Penal Code, or to protect the person or property from some other unlawful or violent attack, as provided in article 572 of the Penal Code. If Taylor, under the circumstances, had killed one or all of the convicts, he would not have committed murder. He was making use of no more force than was necessary to effect their capture, and the trailing them with dogs was not unlawful or improper, and was the usual means resorted to in such cases. The fact that the slayers of Taylor were convicts, and killed him in an attempt to secure their liberty, in no degree excuses, justifies or extenuates the crime. ( *Washington* v. *The State*, 1 Texas Ct. App., 647; *Waite* v. *The State*, 13 Texas Ct. App., 169.)

We find no error in the conviction. A brave and faithful officer, while in the proper discharge of his duty, was ruthlessly and deliberately shot dead by this defendant and his companions, without legal cause or provocation. The defendant may congratulate himself that the jury spared his life. The judgment is affirmed.

*Affirmed.*

[Opinion delivered February 20, 1886.]